Good afternoon, your honors, and may it please the court. My name is John Flanagan and I am pro bono counsel for the petitioner. And I did just want to note that I represented the petitioner as qualified representative under the Franco Gonzalez permanent injunction in his agency proceedings, Mr. Iglesias. Thank you very much for your pro bono representation and for, and to your firm as well, Becker and Lee for allowing you to do that. Thank you, your honor. Uh, Mr. Iglesias-Iglesias in this case raises two principal challenges to BIA decision in this case. First, that it was improper to foreclose petitioner's asylum claim on the base, the basis that his undisputed mental illness did not constitute a particular social group within the meaning of this court's precedent and agency law. Second, the agency applied the incorrect standard of proof disregarded relevant evidence and violated petitioner's due process in consideration of his claim under the convention against torture. I want to turn first to the asylum claim as to the, as to the asylum claim, this court should apply de novo review to the question of whether the undisputed evidence shows that petitioner's proposed particular social groups meet the three-part test in matter of the MUVG by one, referring to immutable traits, two, respecting particular and discreet boundaries, and three, by showing social distinction within Mexican society. A point that I want to emphasize is that although petitioner proffered five proposed particular social groups, if the court finds that any one of these meets the MUVG standard, it must remand because the agency did not conduct the requisite findings with regards to the remaining elements of petitioner's asylum claim. What do you think is your strongest particular social group that's been articulated? Yes, your honor. If I may, I would, I would I would actually like to focus on two of them. The first is Mexicans perceived as loco. And the second is abandonados. I believe that those are the strongest, our strongest groups. And, and in some sense, the other groups are reformulations for purposes of preserving the issues. So with with those two groups in mind, I would like to turn to the, the MUVG test. So first we have immutability. I can deal with that pretty, pretty quickly because the respondent does not dispute that each one of these groups would refer to immutable traits, namely particular petitioner's chronic and perceptible mental illness. The second is the particularity prong. Again, the agency actually does not dispute that abandonados as a group would be particular, but instead asserts that the remaining groups refer to terms that are quote subjective in nature and do not serve to delineate clear boundaries of who would be included. This flies in the face of undisputed evidence that we have in this case. For example, loco is defined in the diagnostic and statistical manual of mental disorders as a severe form of psychosis. And then I would cross-reference the definition of psychosis, which is, you know, delusions and hallucinations, which Mr. Iglesias Iglesias very much suffers from. So can I ask you a question? Are you, are you essentially saying in that category that these folks are going to be institutionalized? Well, I don't want to confuse the issue of persecution with the group membership because you can have a chronic, you can certainly have a chronic mental illness. And if you have adequate family support, as Dr. Reyes Foster testified in her expert opinion, you would have a, you would have a better shot at surviving in this society. But so no, I would, I would not say that they necessarily, it's necessarily persecution is necessarily a piece of the particular social group as to loco. As to loco in particular, it refers to that clinical diagnosis that is within the DSM. Okay. Well, maybe I misunderstood because I was sort of thinking about your case in the context that you were dealing with individuals that were essentially so disturbed that they were unlikely to be amenable to being treated at home. That they were likely to face the horrors of being, as you described them, at least institutionalized. Because it seems to me to be somewhat difficult to sufficiently define a discrete social group. If you're, you know, at least I struggled with it in the context of just the definition, for example, of loco without the additional element that these are folks that are going to more likely than not end up in an institution. So that in a sense, your honor, the way that the way that this is, that the agency should have looked at this question, I would actually argue that they failed to do this is that first you look at whether the group meets certain boundaries is just defined within some sort of intelligible boundaries and whether Mexican society can distinguish between individuals that have those immutable and discrete traits and those that do not. It does not flow from that, that the person has to be persecuted. So I would argue, so for loco in particular, for example, it's a severe form of psychosis, it's a severe form of psychosis with attendant, you know, manic and severe symptoms, but it does not follow that those persons are necessarily persecuted. And in fact, I wasn't, I'm not even necessarily asserting that institutionalization is persecution, but turning to the third piece of the MEVG test, that is the social distinction test, the board actually does conflate these two issues because it says that the evidence does not show that Mexican society treats these individuals with severe psychotic illnesses differently than those with other mental disorders. And that's actually not the, that's not the standard from MEVG. The standard is whether quote, meaningful distinctions can be made. And in the context of loco, for example, we have two kinds of sort of social or culturally cognizable mental illness formulation. That's nervios, which is more transient and something like what we might think of as anxiety or mood disorder that's transient. And then something that's chronic would merit the designation of loco. And so there are meaningful distinctions made in that sense. And whether that leads someone down the path of persecution is, as Dr. Reyes-Foster explained, entirely dependent on their support network. And then as far as abandonados, because again, the agency conceded that that would be a that would be a satisfied particularity, they again put petitioner in sort of a catch-22 by saying, oh, that's just labeling essentially, or that's just a term that's used. That flies in the face of the unrebutted testimony that abandonados is widely used to refer or to distinguish from individuals in the community. And it's used to refer to individuals like petitioner who suffer a severe and perceptible disability and lack family support. And then with respect and then, as I mentioned, with respect to locura or loco, the status of being loco, it's meaningfully distinguished between individuals with nervios or individuals that don't have a mental illness at all. In sum, we would submit that we've met all three elements of the MEVG test and therefore a petitioner should have the opportunity to present the remaining elements of his asylum claim. So with that, and also I do want to mention again, I do want to emphasize the standard of review here, because as the court noted, this court has noted in Mendoza-Alvarez, the overall particular social group determination is subject to de novo review. So this court has a chance to take a second look at the agency's determinations and the way that it characterized the evidence in determining whether petitioner has articulated a particular social group. Next, I want to turn to the claim under the Convention Against Torture. With respect to the torture convention claim, the agency conceded that the worst practices of Mexican psychiatric institutions, namely the uses of restraints, electroconvulsive shock treatment and lobotomies could constitute torture under the convention. However, the agency misapplied the burden or ratified the use of an evidence to first find that petitioner was not likely to be institutionalized. Second, that his torturers would not act with the requisite intent required by the convention. And third, that such torture would not be inflicted or acquiesced to by a state authority. In addition, the BIA improperly considered petitioner's claim as to Mexican prisons in the first instance, without offering the immigration judge an opportunity to weigh in and failed to consider a due process issue that petitioner raised with respect to the treatment of expert testimony. Turning to the burden of proof, the first error we assert on the CAT claim, the court should reverse de novo because the BIA rubber stamped an IJ decision that plainly applied the incorrect burden of proof. In this case, the IJ faulted petitioner for failing to show that torturous treatment occurred at all psychiatric facilities. As this court explained in Jamuy the Ashcroft, petitioner did not show a certainty of torture, only a chance greater than 50%. Therefore, the BIA erred when it simply stated that it discerned no error or no factual or legal error in this decision. To the contrary, there was a structural legal error that requires this court's reversal. On the issue of disregarded evidence, I first want to say that the BIA did not specifically rule on whether petitioner was likely to be institutionalized. But on that point, nor did the BIA or the IJ consider our unrebutted declaration from a consular officer that makes that outcome a foregone conclusion. That is that a person in Mr. Iglesias Iglesias' state would be personally accompanied on his journey back to Mexico and very likely placed in an institution if he did not have family members to receive him, which he does not. On the issue of specific intent, the BIA endorsed the IJ's conclusion that the mere existence of a relatively rare alternative model of mental health treatment called the Hidalgo model was dispositive and showed that there was no specific intent to torture petitioner. Setting aside whether that the Hidalgo model is still in effect, which we would contest, this decision completely ignored evidence that, first of all, Hidalgo model facilities do not exist in petitioner's native Oaxaca. And second, they're relatively rare across the country. The Disability Rights International in 2015 visited over dozens of facilities, more than 20 facilities. Only three of those were Hidalgo model facilities. And actually, they weren't even allowed to go in. So and then turning to the specific record, we have evidence that that the treatment in these facilities, namely electroshock and the use of restraints, are used for coercion, behavior modification. And in the world. Yes, your honor. I'm interested in the widespread use of overmedicating the patients with psychotropic substances to modify their behavior or make them cooperative. And the reason I'm interested in that is because the implementing regulations, 8 CFR section 1208, 18, I guess it's A4, specifically refers to is what are the definitions of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality and the IJ, neither the IJ or the BIA really addressed that point. Yes, your honor, I would agree with that. And I would also add to the issue of overmedication, which was flagged by Disability Rights International is widespread in facilities. In addition, electro convulsive therapy treatment, one of the reasons it's so dangerous is that it can disrupt memory and cause other profound changes to the character. And I see that I am also evidence that they that in these institutions, such methods, disperse medication or the electro shock therapy is intentionally used to harm the patients. Yes, your honor. At 524 of the administrative record, there is a discussion of electro shock therapy being used to force patients to eat to eat the hospital food and to and for other forms of punishment behavior modification. And I see that I'm running short on time and I do want to reserve time for rebuttal. So at this point, I will hold back and reserve my time. All right. Thank you, counsel. Ms. Browning. Thank you, your honor. May it please the court, Rachel Browning for the United States Attorney General. Responding acknowledges that petitioner's condition will likely present him with certain challenges upon removal due to his mental illness. Nevertheless, the agency properly concluded that he failed to establish eligibility for asylum related relief and protection from removal. And the record evidence does not compel a contrary result. Addressing the agency's asylum and particular social group determination, the agency probably found that all of the aforementioned groups are sorry for the five aforementioned groups lacked particularity. And with respect to the term, the terms themselves, even if they can, they are defined within the diagnostic manual that doesn't take away from their subjective nature or the fact that those that those terms that that terminology could apply to a wide swath of individuals within Mexico. And so what the board was concerned with is that there were not sufficient boundaries to limit who would be included in in such a group. And this court in Mendez Alvarez, for example, acknowledged that two larger groups with different conditions and different circumstances lacks sufficient particularity. And in that group was individuals who were insulin dependent, who exhibited, who had mental health issues. In an unpublished decision, Carasso versus Barr, the court also found that a very similarly formulated group of individuals with mental illness with severe or chronic mental illness lacked sufficient particularity simply because there's no these could refer to people of any number of conditions, not just people with delusional disorder and people with means people who are poor, men, women, children. And so it does encompass too broad a group of individuals to meet the particular requirement. What about the Abandoneros who are both loco and lacking family support? That the as as opposing counsel pointed out, the agency didn't actually rule on whether that particular group met the particularity requirement. It dismissed that group on grounds of lack of social distinction. And that is supported by the record as well, because when you look at the evidence that petition refers to, Abandoneros could be institutionalized for any number of reasons, including just lack of family support where there's no mental illness at play. And it speaks more to a lack of a social safety net in Mexico, which this court again in Mendoza Alvarez said is not persecution on account of a particular social group on a protected ground. If you look at the evidence. Sorry, I lost my place. There are various reasons why someone might end up institutionalized. So there's a lot there's insufficient evidence demonstrating that society views people who are institutionalized as a specific group, whether it's because of their abandoned status, a lack of family support, mental illness, could be any number of things. So I think that's what the agency was getting at when it projected the trip of Abandoneros as being insufficiently distinct, socially distinct. And I would just note that the expert herself, Dr. Reyes Foster, couldn't state with any specificity how many individuals in Mexico even have petitioner's type of delusional disorder, nor how many of them would be institutionalized. So I think what the agency was troubled by was just the lack of very specific evidence that this particular group existed, first and foremost, and that upon his removal, petitioner would be labeled as such and then institutionalized because of that. I mean, isn't the likelihood that he's going to be institutionalized 100 percent? I mean, the guy's walking around thinking he's the king of this and owns this. How long is a guy like that, if a bus takes him to Tijuana, not going to be institutionalized? Well, Your Honor, the record doesn't establish that was his burden. And in fact, he's been in the United States since 2003. He's not been institutionalized. The judge noted that with respect to the cat claim, didn't point that out with respect to asylum or withholding, but I think it's relevant that he and also the doctor who have been times when he has held down a job. He's self-supportive. There's no evidence that he's had to rely on on benefits from the government or anything of that nature. So I think with that in mind. Well, he's had some support network here, though, hasn't he? I think since he's been in detention only because of once he came to the attention of the authorities. But I don't know if Mr. Flanagan can maybe correct us on rebuttal, but I didn't that was not brought to the attention of the judge or the board. So I don't have that information. Is he in detention right now? I believe so, yes. And has been since when? 2016, I believe. He's been in detention for over three or four years. I'm sorry, I don't have the record in front of me. Did the IJ make a finding as to specific intent? With respect to torture, yes. Could you point that out, please? On page 90 and 91 of the record is where the immigration judge discusses cap protection, and he states that. Just did not show that each element in the hypothetical chain of events is more likely not to occur, although he could come to the attention of the Mexican authorities. The evidence does not establish that he was committed, that he would be tortured with the acquisition of the government, acquiescence of the government. Respondent has no history of hospitalization or psychotic break or institutionalization. And the judge did refer to evidence of what would happen upon repatriation, which is that consular officer or somebody accompanies him to Mexico. There's a chance that he would be turned over to the authorities. However, what the judge says is that that doesn't in itself establish that he would then be institutionalized and then tortured with the acquisition of the government. What the evidence shows is what this court has found in numerous other cases of this nature, which is that the deplorable conditions in and of themselves and methods that are used, while we don't condone, nevertheless, do not indicate that Mexico, that the Mexican authorities have implemented these and put these in place with these specific intent to torture or to cause harm, pain and suffering. Well, but what does that mean? Specific intent is that your contention that if someone is subject to sexual abuse while in prison, that somehow we need to get into the question of whether they had specific intent, but it's not obvious or overmedicating folks or providing them with electric shock therapy when it's not medically indicated. Do you think that we need to get into evidence that there's specific intent? Isn't it self-evident? You're speaking, Your Honor, of the intent of the individual who commits that act. What we're saying is that those acts in and of themselves do not establish intent on behalf of the government. But doesn't the evidence that's essentially refuted indicate that these activities are sufficiently widespread? The government didn't dispute that to make them a real problem in Mexico. The evidence did not. And what the agency found is that it was not sufficiently widespread enough to indicate the government has sanctioned this type of treatment. But the basis for finding that it wasn't widespread was based upon this hypothetical Hildago model or Hildago model that was... which the immigration judge noted has possibly not been sufficiently implemented. But the fact that the government has been taking steps toward making it better and the judge did note that the types of treatment that people received in hospitals does vary from region to region. And so it was incumbent upon the petitioner to put forth evidence demonstrating that the place that he would most likely, more likely than not, end up would more likely than not torture him. This is a very high burden. And again, we don't discount that. Sure. If there was no evidence that any place in a place where he might live had, you know, was following the Hidalgo model or any model that provided civilized treatment. Sorry, what was your question? Well, I don't understand the sort of basis of the government's evidence, I suppose, that is contrary to the evidence submitted by the petitioner. What the judge found was simply and what the board has said in numerous decisions and what this court said in Blandino is that you have to establish that each step in the process is more likely than not to occur in order to establish your high probability of torture by or with the acquiescence of the government. In this case, the judge found and the board noted, didn't note specifically the finding that he had not been institutionalized in the past, but it did accept the findings of the immigration judge. That's part of the record, which is that he's never been institutionalized before. And there was insufficient evidence to establish that that would even happen. But then you get to, well, where is he going to be institutionalized? And then there, I mean, the evidence does not suggest that everybody in institutions in Mexico is being tortured. And there is evidence that the government is making inroads or trying to address the problem, which takes away the acquiescence from. You can't say that a government is acquiescing when they're aware of a problem and they're implementing solutions. They may not be perfect solutions and there may be, I mean, obviously much improvement needs to be made. But we'd submit that that because of that evidence, the government since the petitioner simply has not met his burden of establishing a high probability that he more likely than not will be tortured by or with the acquiescence of the government. In Mexico. And I would just speak briefly to petitioner's argument that, you know, the judge somehow discounted corroborative or required corroborative evidence unfairly. The judge did take note of the offer of proof by Dr. Reyes Foster and but noted that that didn't, you know, that didn't meet the requirement. Simply saying that her belief that because these practices happened in Yucatan, that would happen everywhere else, that the other record evidence simply did not bear that out. The judge did take that evidence into account, as well as the evidence of repatriation. So I just wanted to point that out. And like I said before, the government does not discount the challenges that that this petitioner would face. This is a difficult case. We simply are our position is that his high burden of proof has just not been met in this situation. And we ask that you would deny the petition for review. All right. Thank you, counsel. Mr. Flanagan. You're on mute. OK, thank you, Your Honor. Respectfully, I would dispute my colleague's contention that the risk of being turned over to the authorities that the consular officer flagged that that was I don't I that's not that was not specifically considered by the immigration judge, which is precisely the problem for us. I would and I would note the petitioner has been detained since, unfortunately, since the middle of 2017, partly because he was not amenable to bail, lacks that support network. As to acquiescence, I would just point out that acquiescence to torture and and specific intent to torture can occur on any level. That is, local bad actors can act and can act with specific intent, as they do in many facilities. And if the government stands by and as the international Inter-American Commission on Human Rights flagged, as the number of facilities is increasing, the government cannot just simply bang the old, you know, bang the old drum that, oh, we have this Hidalgo model when it seems to be a relatively rare, a relatively rare treatment model and that is largely going unimplemented and that the prototypical Mexican hospital is abusive. On the issue of particularity, I would just point to this court's opinion in Perdomo and note that the DSM definitions and the country specific definitions make this distinguishable between from Mendoza, Alvarez and Carrozo. And as to abandonados, I would just point this court to the use of that term at, for example, page 726 of the administrative record, noting that it's a term that's used to distinguish readily between individuals. All right, thank you, counsel. Iglesias Iglesias versus Wilkinson is submitted in this session of the court. It's adjourned for today. Thank you, Your Honor. This court for this session stands adjourned.
judges: Wardlaw, Gould, Pregerson